Justin L. James (15167)
Jordan Pate (17634)
JAMES DODGE RUSSELL & STEPHENS, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: 801.363.6363
Email: jjames@jdrslaw.com
jpate@jdrslaw.com

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| JASON BROWN, as trustee of the JASON & NICHOLE BROWN TRUST; JARED YOUNG, as trustee of THE VALIANT TRUST; ALAN SWICK, an individual; TYMICK ENTERPRISES, a Utah limited liability company; MABO HOLDINGS, an Idaho limited liability company; JEREMY ROSENVALL, an individual; REED PROBST, as trustee of the REED R. PROBST TRUST; DANE COVINGTON, an individual; and LANCE MILLER, an individual,<br><br>*Plaintiffs*,<br><br>v.<br><br>JON CHENEY, an individual; JEREMY WHITT, an individual,<br><br>*Defendants*. | **AMENDED COMPLAINT**<br><br>Judge Ann Marie McIff Allen<br><br>Magistrate Judge Dustin B. Pead<br><br>Case No. 2:24-cv-00129-AMA-DBP |

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, Plaintiffs Jason Brown, as trustee of the Jason & Nichole Brown Trust ("Brown"); Jared Young, as trustee of The Valiant Trust ("Young"); Alan Swick ("Swick"); Tymick Enterprises, LLC ("Mickelsen"); MABO

Holdings, LLC ("Fransen"); Jeremy Rosenvall ("Rosenvall"); Dane Covington ("Covington"); Lance Miller ("Miller"); and Reed Probst, on behalf of the Reed R. Probst Trust ("Probst") (collectively, the "Investors"), by and through counsel, amend their complaint and allege and complain of Defendants Jon Cheney ("Cheney") and Jeremy Whitt ("Whitt") (collectively, "Defendants") as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Brown is a trustee of the Jason & Nichole Brown Trust, a Utah trust.

2. Swick is an individual residing in Utah County.

3. Mickelsen is a Utah limited liability company with its principal place of business in Utah County.

4. Rosenvall is an individual residing in Washington State.

5. Fransen is an Idaho limited liability company with its principal place of business in Idaho.

6. Young is a trustee of The Valiant Trust, a Utah trust.

7. Probst is trustee of the Reed R. Probst Trust, a Virginia trust.

8. Covington is an individual residing in Florida.

9. Miller is an individual residing in Utah County.

10. Cheney is an individual residing in Utah County.

11. Whitt is an individual residing in Florida.

12. Pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa, this Court has original subject matter jurisdiction over the claims alleged in this action arising under the laws of the United States, including specifically Investors' claims asserted under 15 U.S.C. § 78j(b) (including S.E.C. Rule

10b-5 promulgated thereunder and codified at 17 C.F.R. § 240.10b-5), 15 U.S.C. § 78t(a), and 15 U.S.C. § 771.

13. The Court has supplemental jurisdiction over the claims asserted herein under state law pursuant to 28 U.S.C. § 1367 because such claims are so related to the claims arising under the laws of the United States that they form part of the same case or controversy under Article III of the United States Constitution.

14. Venue is appropriate in this forum pursuant to 28 U.S.C. § 1391(b)(2) and 15 U.S.C. § 78aa.

15. In connection with the conduct alleged in this Complaint, Defendants directly and indirectly used the means and instruments of interstate commerce, including mail, telephone, and internet communications.

## GENERAL ALLEGATIONS

16. In the Fall of 2021, Cheney and Whitt approached the Investors on multiple occasions, in Utah County, to induced them, through misrepresentations, to invest significant sums of money in their company, Seek XR, Inc.

17. Specifically, in or about August, September, October, and November of 2021, Cheney and Whitt approached each Investor, more than once, about loaning or investing money in his company, Seek XR, through a convertible note (a loan that would be converted to equity).

18. In order to induce each Investor to invest money in Seek XR, Defendants represented to each Investor during this time that Seek XR had received multiple offers to purchase Seek XR from credible and independent outside investors and had received offers ranging from $40 million (Snapchat) to $60 million (Cloudinary) and then another offer from Snapchat for $65

million (collectively the "Offers"); that Seek XR was valued at over $130 million; and that all that was needed to further increase its value was additional capital to hire additional salespersons.

19. These representations were knowingly false. Both Defendants knew that neither Cloudinary nor Snapchat had made a bona fide offer to purchase Seek XR.

20. Rather, Defendants had requested Cloudinary purchase Seek XR for $60 million and Cloudinary flatly refused the invitation and did not make any offer for Seek XR. Likewise, Defendants had requested Snapchat purchase Seek XR for $65 million and received no response.

21. Defendants further represented to each Investor that they had rejected such offers because their own projections and independent valuations were that Seek XR was valued at $130 million—2 times the highest offer they claimed to have received.

22. Defendant's representations that Seek XR was valued at $130 million was also false and not based on any reasonable valuation. Rather, as previously stated, Seek XR had not received any offers, let alone the $40 million, $60 million, and $65 million that Defendants claimed.

23. Notwithstanding, Defendants made the representations about the Offers and the $130 million valuation of Seek XR in order to induce Investors into giving Defendants money.

24. Defendants further represented that they needed a modest investment from Investors (approximately $1.5 million) to be used to hire employees and personnel to generate new clients and service those clients.

25. Defendants stated that Investors' investment would be used solely to hire, train, and compensate salespersons in order to grow Seek XR's revenue and overall value.

26. However, each representation was knowingly false.

27. Defendants knew that Seek XR had not received offers from Snapchat, Cloudinary, or any potential buyer for $40, $60, or $65 million. Indeed, Seek XR had not received any offer, let alone an offer even close to the amounts represented. And because there was never any offer, Defendants also lied about rejecting any such offer.

28. Likewise, Defendants knew that Seek XR had not received a valuation for $130 million or any valuation close to the represented amounts.

29. And Defendants had no intention of using Investors' money for the stated purpose of hiring additional salespersons to grow Seek XR's customer base.

30. Rather, Defendants made each representation for the purpose of defrauding Investors.

31. Indeed, shortly after receiving money from Investors, Defendants took the money invested by Investors and used it for projects unrelated to and that did not benefit Seek XR.

32. Based on Defendants' lies regarding the Offers and the value of Seek XR, as well as Defendants' misuse of the funds invested by Investors, it is obvious that Defendants made their false representations to Investors with the intent to defraud them.

33. Each Investor relied on Defendants' statements and believed they were investing in a company that had received multiple offers in excess of $40 million dollars, had been valued at $130 million, and that their investments would be used to hire salespersons to further increase the value of Seek XR.

34. Based on Defendants' representations that Seek XR had received offers from credible institutions, including Snapchat and Cloudinary, and that Seek XR's revenue forecasts

showed that Seek XR's value would increase significantly over the next several months, Investors agreed to loan/invest money with Seek XR.

35. Specifically, each Investor invested the following amounts:

a. Brown invested $250,000;

b. Young invested $250,000;

c. Swick invested $100,000;

d. Mickelsen invested $150,000;

e. Fransen invested $50,000;

f. Probst invested $100,000;

g. Rosenvall invested $150,00;

h. Covington invested $50,000; and

i. Miller invested $50,000.

36. In total, the Investors invested $1,150,000 in Seek XR based on Defendants' representation of Seek XR's value.

37. Seek XR sent each Investor a "Convertible Promissory Note."

38. Under the Convertible Note, each Investor agreed that "[i]n the event that [Seek XR] issue[d] and s[old] share of its Equity Securities to [other] investors, on or before [the two year anniversary of the note] in an equity financing resulting in gross proceeds to the Company of at least One Million Dollars ($1,000,000)….then the outstanding principal balance of th[e] Note and any accrued but unpaid interest shall automatically convert in whole without any further action by the [Investor] into such Equity Securities at a conversion price equal to one hundred percent (100.00%) of the per share price paid by the [other investors][.]"

39. The Note further defined "Equity Securities" to mean Seek XR's "preferred stock or any securities conferring the right to purchase [Seek XR's] preferred stock or securities convertible into, or exchangeable for…the company's preferred stock[.]"

**FIRST CAUSE OF ACTION**
***Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5***

40. Investors incorporate each of the preceding paragraphs herein.

41. Investors' investment in Seek XR was a security as defined in 15 US Code § 77b(a)(1) in that it involved investment in a common enterprise with the success of the venture dependent primarily upon the efforts of others. Further, the parties' agreements reflected that the investment was a security.

42. Defendants made untrue statements of material fact and omitted material facts necessary to make the statements not misleading, in violation of Rule 10b-5.

43. The material misrepresentations and omissions were made in connection with the offer to sell a security.

44. Such material misrepresentations and omissions include Defendants' representations that Seek XR had received offers from Cloudinary and Snapchat that placed Seek XR's value above $40 million, when in fact no such offers had ever been received; that Defendants rejected such offers, when in fact they did not; and that Defendants would use Investors' investments to hire sales personnel, when in fact they took Investors' money and used it for personal uses unrelated to Seek XR.

45. Defendants never corrected such misrepresentations despite knowing the falsity of each representation.

46. Defendants made the material misrepresentations and omissions through both verbal and written correspondence with Investors.

47. Defendants' material misrepresentations and omissions were made through the means or instruments of communication in interstate commerce or the mails—including telephone lines, email transmission over the internet, and the United States Postal Service.

48. Defendants acted knowingly in making material misrepresentations and omissions, or should have known but acted with severe recklessness as to their truth.

49. The foregoing misrepresentations and omissions were material to each of the Investors' decisions to invest in Seek XR. Investors would not have invested had they known the true facts—Seek XR had not received a valuation anywhere close to the amounts represented and had not received valuations from any reputable business.

50. The misrepresentations and omissions caused Investors to suffer extensive damages in an amount to be proven at trial, but in no event less than the amount of their investment.

**SECOND CAUSE OF ACTION**
***State Securities Fraud – Utah Code § 61-1-1 et seq.***

51. Investors incorporate each of the preceding paragraphs herein.

52. Under the Utah Uniform Securities Act, Defendants were prohibited from making "any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading" and other obligations. *See* Utah Code § 61-1-1 et seq.

53. Defendants made statements and omitted facts in violation of Utah Code § 61-1-1.

54. Investors relied upon the statements and omissions in investing in Seek XR.

55. Pursuant to Utah Code § 60-1-22, Defendants are liable for the amount of Investors' investments, together with 12% interest per year, reasonable attorney fees, and costs.

56. Additionally, because Defendants' misrepresentations and omissions were intentional or reckless or intentional, the Court should award Investors in an amount equal to three times their investment amounts, interest, costs, and attorney fees. *See* Utah Code § 61-1-22(2).

**THIRD CAUSE OF ACTION**
***Fraud in the Inducement***

57. Investors incorporate each of the preceding paragraphs herein.

58. Defendants made false statements about material facts regarding the valuations of Seek XR, having received and rejected the Offers, and how Investors' funds would be used (collectively the "False Statements").

59. Defendants told each Investor the False Statements in person, through telephone calls, text messages, and emails.

60. Specifically, in or about August 2021, Defendants met with each Investor to discuss their "investment" into Seek XR. At those meetings, Defendants stated that Seek XR had received the Offers and that Seek XR had rejected those Offers. Defendants also represented that Seek XR was valued at $130 million and that Investors' investment would be used to hire salespersons to further grow Seek XR's revenues. Each of those statements were false.

61. Defendants made the statements knowing that each statement and category were false. Defendants knew that Seek XR had not received any offer from Cloudinary or Snapchat, let alone offers for $40 million, $60 million, and $65 million. And because there were no Offers, Defendants knew that their representations that they had rejected such offers were also false. Finally, Defendants knew that they intended to use Investors' investments into Seek XR for matters

and purposes other than to hire salespersons. Indeed, based on Defendants' use of Investors' money to fund personal projects unrelated to Seek XR, it is apparent that Defendants made all of their misrepresentations for the purpose of defrauding Investors from their money and that Defendants had no intention of using Investors' money for the stated purpose.

62. Defendants made these statements in order to induce each Investor to invest in Defendants' company and for the purpose of obtaining Investors' money to then use such money for Defendants' own personal use and in matters unrelated to Seek XR.

63. Alternatively, Defendants made the statements recklessly and without regard for their truth.

64. Defendants intended that Investors rely on the statements.

65. Investors reasonably relied on the statements in deciding to invest in Seek XR and provide their investments.

66. As a result of Defendants' conduct, Investors suffered damages in an amount to be proven at trial, but in no event less than the amount of their investments.

**FOURTH CAUSE OF ACTION**
***Negligent Misrepresentation***

67. Investors incorporate each of the preceding paragraphs herein.

68. Defendants had a duty to inspect and to disclose fully and fairly facts materially related to the financial valuations and value of Seek XR.

69. Defendants made false representations to Investors as detailed herein.

70. Defendants owed a duty of reasonable care to Investors independent of any contractual obligation.

71. Defendants knew such representations were false or were negligent in making such representations.

72. Defendants were negligent in representing the value of Seek XR.

73. Defendants knew or should have known the misrepresentations were false.

74. Defendants made their misrepresentations in an effort to induce Investors into investing in Seek XR.

75. The foregoing misrepresentations and omissions were material and were reasonably relied upon by Investors in making their investment.

76. As a result of Defendants' negligence, Investors have been damaged in an amount to be proven at trial.

**REQUEST FOR RELIEF**

WHEREFORE, Investors request judgment against Cheney and Whitt, jointly and severally, as follows:

a. For actual damages in an amount to be determined at trial, but in no event less than $1,150,000;

b. For punitive or exemplary damages;

c. For statutory damages;

d. For consequential damages in an amount to be determined at trial;

e. For equitable relief as found appropriate by this Court;

f. For costs and attorney fees; and

g. For such and other relief as the Court may deem just and appropriate.

DATED this 8th day of May, 2024.

JAMES DODGE RUSSELL & STEPHENS, P.C.

*/s/ Justin L. James*
Justin L. James
Jordan Pate

*Attorneys for Plaintiffs*